COMMONWEALTH *vs.* MICHAEL DEPEIZA.

Suffolk. March 8, 2007. - June 15, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Practice, Criminal,* Motion to suppress. *Search and Seizure,* Threshold police inquiry, Protective frisk, Reasonable suspicion. *Threshold Police Inquiry. Constitutional Law,* Investigatory stop, Search and seizure, Reasonable suspicion. *Firearms.*

Police officers, by stepping out of an unmarked vehicle, approaching a criminal defendant, and accepting the defendant's identification when voluntarily offered, did not seize the defendant within the meaning of the Fourth Amendment to the United States Constitution [369-371]; however, a seizure did occur once the officers announced their intention to frisk the defendant, an investigatory stop that was constitutionally justified by the officers' reasonable suspicion (based on the character of the neighborhood, the defendant's "straight arm" manner of walking, and his nervousness and furtive movements when talking to the police) that the defendant was committing the crime of carrying a concealed, unlicensed firearm, and that he was therefore armed and dangerous [371-375]; further, the defendant failed to demonstrate that his incriminating statement, made between the announcement of the patfrisk and the frisk itself, was the result of a custodial interrogation without the benefit of a Miranda warning [375-376].

COMPLAINT received and sworn to in the Dorchester Division of the Boston Municipal Court Department on April 27, 2005.

A pretrial motion to suppress evidence was heard by *Robert N. Tochka,* J., and the case was heard by *E. Sydney Hanlon,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Paul B. Linn,* Assistant District Attorney, for the Commonwealth.

*Robert E. Fox* for the defendant.

IRELAND, J. Two Boston police officers found a loaded handgun in Michael DePeiza's jacket pocket when they pat frisked him in a late night encounter. The defendant was charged with illegal possession of a firearm and ammunition, in viola-

tion of G. L. c. 269, § 10 (*a*) and (*h*). After a hearing in the Dorchester Division of the Boston Municipal Court, a judge denied the defendant's motion to suppress the handgun, ammunition, and statements he made to police. Following a jury-waived trial, the defendant was convicted of both charges. He appealed from the convictions, claiming that his motion to suppress was improperly denied. He argued that the handgun and ammunition found during the patfrisk were the fruit of an illegal *Terry*-type investigative stop and protective frisk. *Terry* v. *Ohio*, 392 U.S. 1, 21 (1968). The Appeals Court reversed the judgments of the District Court. *Commonwealth* v. *DePeiza*, 66 Mass. App. Ct. 398 (2006). We granted the Commonwealth's application for further appellate review. We affirm the denial of the motion to suppress, and the defendant's convictions.

1. *Background.* We recite the facts as found by the motion judge, supplemented by undisputed testimony from the suppression hearing. See *Commonwealth* v. *Feyenord*, 445 Mass. 72, 73 (2005), cert. denied, 546 U.S. 1187 (2006).

On April 27, 2005, shortly after midnight, the defendant was walking through the Dorchester section of Boston while talking on his cellular telephone. Officers John Conway and Dean Bickerton were on patrol in the neighborhood, a high crime area known for a number of incidents involving firearms. As they drove past the defendant in their unmarked vehicle he attracted their attention because of his odd way of walking. As he held his telephone to his ear with his left hand, he held his right arm stiff and straight, pressed against his right side. As part of their training at the police academy the officers had learned that this distinctive "straight arm" gait was one sign of a person carrying a firearm by pressing it against his body with the stiff arm.

The officers reversed direction and, without activating their lights or sirens, drove past the defendant a second time. As they approached the defendant again they called out to him.[1] They engaged him in a short conversation during which the defendant continually shielded his right side from the view of the officers,

[1]The defendant testified that the officers yelled, "Hey, Dwayne." The officers testified that they did not know the defendant's name, but called out to him with a false name in order to engage him in conversation and observe him more closely.

as if trying to hide something. At some point during that conversation both officers stepped out of the car. The officers noticed the defendant looking from left to right and shifting his weight from side to side, actions which, in the officers' experience, were signs that the defendant was nervous and likely to run. The defendant told the officers that his family lived nearby, but that he was from New York City. Without being asked, he offered his student identification and driver's license to the officers. As the defendant reached for his identification the officers noticed two additional details that further raised their suspicions. First, as the defendant reached into his right rear pants pocket, he continued to turn his right side away from them in an awkward motion. Second, they noticed that the right pocket of his jacket appeared to contain "something heavy." Bickerton reached out to pat frisk the defendant, who jumped back. Bickerton explained that he wanted to conduct a patfrisk, and reached out again to conduct the frisk. A handgun was recovered from the defendant's right jacket pocket.

2. *Discussion.* When reviewing a motion to suppress, we adopt the factual findings of the motion judge absent clear error. *Commonwealth* v. *Catanzaro*, 441 Mass. 46, 50 (2004), and cases cited. We "independently determine the correctness of the judge's application of constitutional principles to the facts as found." *Id.* It is the Commonwealth's burden to demonstrate that the police officers' stop and frisk of the defendant was within constitutional limits. *Commonwealth* v. *Vuthy Seng*, 436 Mass. 537, 550, cert. denied, 537 U.S. 942 (2002), and cases cited.

a. *Investigative stop and protective frisk.* Before determining whether the actions of the officers in stopping the defendant were constitutionally permissible, we must first identify the moment when the seizure occurred. See *Commonwealth* v. *Sykes*, *ante* 308, 314 (2007); *Commonwealth* v. *Barros*, 435 Mass. 171, 173 (2001). "[N]ot every encounter between a law enforcement official and a member of the public constitutes an intrusion of constitutional dimensions requiring justification." *Commonwealth* v. *Stoute*, 422 Mass. 782, 789 (1996). A person is seized by the police only when, in light of all of the attending circumstances, a reasonable person in that situation would not feel free to leave. *Id.* at 786.

The officers did·not seize the defendant when they first stepped out of their car. Considering all of the circumstances, a reasonable person in the defendant's situation would have felt free to leave during that initial part of the encounter. The tone of the officers' interaction with the defendant was conversational and not aggressive. See, e.g., *Commonwealth* v. *Thomas*, 429 Mass. 403, 406 (1999) (no seizure where officer asked questions without show of authority); *Commonwealth* v. *Fraser*, 410 Mass. 541, 544 (1991) (no seizure where officer's request that defendant remove hands from pocket "was not sufficiently coercive or intimidating"); *Commonwealth* v. *Gunther G.*, 45 Mass. App. Ct. 116, 118 (1998) (no seizure in absence of "intimidating or assertive conduct"). The positioning of the two officers on either side of the defendant did not block his path or otherwise restrict his freedom of movement. Compare *Commonwealth* v. *Barros*, *supra* at 174 (no seizure where police remained in cruiser without impeding or restricting defendant's freedom of movement), and *Commonwealth* v. *Pagan*, 63 Mass. App. Ct. 780, 782 (2005) (no seizure "by simply alighting from the police cruiser and approaching" defendant), with *Commonwealth* v. *Thompson*, 427 Mass. 729, 733, cert. denied, 525 U.S. 1008 (1998) (concluding there was seizure where police parked cruiser to block defendant's car). The officers did not order the defendant to stop or to answer their questions. See, e.g., *Commonwealth* v. *Barros*, *supra* at 175-176 (request that defendant stop for questions transformed into seizure by later pursuit and command to "[c]ome here"); *Commonwealth* v. *Grandison*, 433 Mass. 135, 138-139 (2001) (encounter became stop when officer emerged from cruiser and commanded defendant to stop). Any subjective intent the officers may have had to pat frisk the defendant could have no impact on whether he felt free to leave. See, e.g., *Commonwealth* v. *Barros*, *supra* (officers' uncommunicated intent irrelevant to "free to leave" analysis). Nor was the defendant seized when he voluntarily offered his identification to the officers. That the officers accepted the identification when offered, and held it during the brief conversation that followed, does not "amount to a show of official authority such that 'a reasonable person would have believed that he was not free to leave.' " *Florida* v. *Royer*, 460

U.S. 491, 502 (1983) (plurality opinion), quoting *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.).

The Commonwealth concedes that the officers seized the defendant once they announced their intention to frisk him.[2] Such an investigatory stop is constitutionally justified if it is conducted on reasonable suspicion that the person seized has committed, is committing, or is about to commit a crime. See *Commonwealth* v. *Wilson*, 441 Mass. 390, 393-394 (2004); *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974). That suspicion must be grounded in " 'specific, articulable facts and reasonable inferences [drawn] therefrom' rather than on a 'hunch.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Lyons*, 409 Mass. 16, 19 (1990). See *Terry* v. *Ohio*, 392 U.S. 1, 21 (1968). "Seemingly innocent activities taken together can give rise to reasonable suspicion justifying a threshold inquiry." *Commonwealth* v. *Sykes*, *supra* at 314, quoting *Commonwealth* v. *Grandison*, *supra* at 139.

Although the question is a close one, we conclude that by the time the officers announced the patfrisk, they reasonably suspected that the defendant was committing the crime of carrying an illegal firearm, and the stop was therefore justified. This conclusion follows from the combination of the many factors found by the motion judge. The police encountered the defendant shortly after midnight in a high crime neighborhood with increasing incidences of firearm violence. He was walking with his right arm held stiff and straight against his body, which, based on the officers' training at the police academy, suggested he was carrying a concealed firearm. While speaking with the officers the defendant appeared nervous, looking from left to right and shifting his feet, as if ready to run. Finally, and most significantly, throughout the encounter the defendant repeatedly hid his right side from the officers' view, and when the officers

---

[2] This point was conceded in the Commonwealth's brief. The Commonwealth argues elsewhere in its brief that reasonable suspicion was not required to justify the officers' patfrisk of the defendant because at no point in the encounter was the defendant stopped. Because we conclude that the officers had reasonable suspicion when they announced the patfrisk, we need not decide whether they required reasonable suspicion for their actions, or whether a lesser standard might have sufficed.

finally glimpsed that side they noticed that his right jacket pocket appeared to hold a heavy object.

The defendant argues that the judge's finding that the encounter took place in a high crime area was clearly erroneous. He points to Officer Conway's testimony commenting on three police reports describing incidents in the area in which he personally had been involved.[3] The defendant argues that those reports do not establish that the neighborhood was a "high crime" one, and that the judge's finding to that effect was therefore clear error. We disagree. Officer Conway had previously testified that the officers spotted the defendant in an area that had experienced a recent increase in incidents of firearm violence, and that they were patrolling the area for that reason. The judge was entitled to credit the officer's testimony that there were increasing incidents of firearm violence in the area. See *Commonwealth v. Yesilciman*, 406 Mass. 736, 743 (1990) (deferring to motion judge's determination about weight and credibility of testimony presented at suppression hearing). This is so even though the record does not contain descriptions of incidents in which the testifying officer was personally involved. The judge appropriately considered the high crime setting of the encounter, together with other factors, to conclude that the officers had reasonable suspicion that the defendant was committing a crime. See *Adams v. Williams*, 407 U.S. 143, 147-148 (1972); *Commonwealth v. Thompson, supra* at 733-734.

The defendant also argues that neither the "straight arm" walk nor the nervous movements observed by the officers could support the reasonable suspicion that he was carrying a firearm. Although nervous or furtive movements do not supply reasonable suspicion when considered in isolation, they are properly considered together with other details to find reasonable suspicion. See *Commonwealth v. Santaliz*, 413 Mass. 238, 241 (1992); *Commonwealth v. Pagan, supra* at 782-783; *Commonwealth v. Robie*, 51 Mass. App. Ct. 494, 497-498 (2001). The defendant also argues that the "straight arm" walk was too am-

---

[3]One incident was a domestic assault involving a firearm. In another, police recovered shell casings but no firearm. The third report had an incorrect identification number and so the details of the incident were unavailable at trial.

biguous a factor, applying to too large a category of innocent people, to be of any weight, and that the officers' suspicions raised by the walk could amount to no more than a hunch. We disagree. That there may be innocent explanations for the walk does not remove it from consideration in the reasonable suspicion analysis. *Commonwealth* v. *Roland R.*, 448 Mass. 278, 284-285 (2007), quoting *Commonwealth* v. *Watson*, 430 Mass. 725, 729 (2000). The officers' suspicion that the odd way of walking was a sign of a firearm was not a mere hunch, but was the result of the application of their experience and training at the police academy to their detailed observations of the defendant. See *Commonwealth* v. *Silva*, 440 Mass. 772, 784 (2004) (police may rely on their experience and training as basis for reasonable suspicion of crime).

The defendant next argues that the factors cited by the Commonwealth imply only that the defendant was carrying a concealed firearm. He reasons that because carrying a concealed firearm is not a crime, the officers' observations could not have supplied the reasonable suspicion necessary to justify his seizure. The mere carrying of a concealed firearm is not a crime, thus observations suggesting a concealed firearm, with nothing more, do not provide reasonable suspicion for a stop. *Commonwealth* v. *Alvarado*, 423 Mass. 266, 269 (1996). *Commonwealth* v. *Couture*, 407 Mass. 178, 183, cert. denied, 498 U.S. 951 (1990). However, when such police observations are coupled with other factors, there may be reasonable suspicion of a crime. See *Commonwealth* v. *Haskell*, 438 Mass. 790, 793-794 (2003) (publicly loading handgun in high crime area at 2 A.M. creates reasonable suspicion of imminent crime). Here the officers relied on additional factors to form their reasonable suspicion that the defendant was carrying an illegal gun. The defendant was in a high crime area shortly after midnight and walking with a "straight arm" gait. Most persuasively, the defendant continually attempted to hide his pocket from the officers' view. When a person attempts to conceal something from the police, that concealment can contribute to the reasonable suspicion necessary to support a stop. See, e.g., *Commonwealth* v. *Sykes*, *ante* 308, 315 (2007) (abandoning bicycle to avoid police contributed to reasonable suspicion); *Commonwealth* v. *Grandi-*

*son, supra* at 139-140 (pedestrian's change of direction to avoid police considered for reasonable suspicion); *Commonwealth* v. *Wren*, 391 Mass. 705, 708 n.2 (1984) ("attempt to avoid contact with or observation by the police" may contribute to reasonable suspicion).

The defendant's reliance on *Commonwealth* v. *Alvarado, supra*, and *Commonwealth* v. *Couture, supra*, is misplaced. In those cases we held that there could be no reasonable suspicion of carrying an unlicensed firearm based only on the bare suspicion of carrying a concealed firearm. In this case, not only was the defendant carrying a concealed firearm in his pocket, but he was also concealing his pocket from the police. It is the concealment of his pocket from police that supplies the reasonable suspicion that the firearm was illegal.

We conclude, as did the judge, that the officers' patfrisk of the defendant also fell within constitutional limits. A patfrisk is constitutionally permitted when conducted by officers who reasonably believe the subject to be armed and dangerous. *Commonwealth* v. *Wilson*, 441 Mass. 390, 394 (2004), citing *Terry* v. *Ohio*, 392 U.S. 1 (1968). Such a frisk is justified by the officers' reasonable fear for their own safety or the safety of the public. *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974), citing *Terry* v. *Ohio, supra* at 27. Here, the officers reasonably believed that the defendant was carrying a concealed, unlicensed firearm, and that he was therefore armed and dangerous. See *Commonwealth* v. *Fraser*, 410 Mass. 541, 546-547 (1991) (officers justified in conducting protective frisk, with no reasonable suspicion of criminal activity, when they reasonably believed defendant had firearm).

The defendant argues that the officers could not have been afraid for their safety because they allowed him to reach into his pocket to retrieve his identification, a gesture he argues they would not have permitted had they truly believed that he was armed and dangerous.[4] This argument overlooks the judge's finding that it was the defendant's very act of reaching into his

---

[4]The defendant contends that the motion judge's findings concerning production of his identification are clearly erroneous. We have reviewed the record and conclude that there was substantial evidence to support the judge's findings regarding the officers' reasonable fear for their safety. Although there

pocket that raised the officers' suspicions that he was carrying an illegal firearm. This same observation distinguishes this case from *Commonwealth* v. *Torres*, 424 Mass. 153, 158 (1997), in which we held that an officer must end a traffic stop once a motorist has produced the appropriate identification and registration. Here, the defendant produced valid identification before he was seized. Unlike a traffic stop, this encounter did not rise to the level of a seizure until after the identification was produced.

b. *Miranda warning.* The defendant argues that an incriminating comment made immediately after Officer Bickerton announced the patfrisk, but before he had conducted the frisk, was the result of a custodial interrogation without the benefit of a Miranda warning and should therefore be suppressed.[5] The motion judge did not rely on the comment when denying the defendant's motion to suppress. Furthermore, the defendant has provided no indication of how the comment was used by the Commonwealth at his trial, or even if it was used at all. In any event, we conclude the statement was not made during a custodial interrogation, and therefore need not be suppressed.

Not every *Terry*-type investigative stop results in a custodial interrogation. *Berkemer* v. *McCarty*, 468 U.S. 420, 440 (1984). *Commonwealth* v. *Haskell, supra* at 795 n.1. *Commonwealth* v. *LaFleur*, 58 Mass. App. Ct. 546, 548 (2003).. "A person is in custody whenever he is 'deprived of his freedom of action in any significant way.' " *Commonwealth* v. *Almonte*, 444 Mass. 511, 517, cert. denied, 546 U.S. 1040 (2005), quoting *Commonwealth* v. *Groome*, 435 Mass. 201, 211 (2001). A variety of factors are considered in that determination. See *Commonwealth* v. *Almonte, supra* at 517-518. It is the defendant's burden to

was conflicting testimony about which officer received the identification and precisely when it was produced, there was also testimony that it was the defendant's gesture of reaching into his pocket to produce the identification that caused the officers reasonably to believe their safety was at risk.

[5]Although the defendant refers generally in his brief to "statements" made after the officers announced the frisk, he only addresses the specific circumstances of one statement, in which he allegedly said he would not "blast" the officers. Officer Bickerton testified that after he announced that he would conduct a patfrisk, he asked, "Do you have a gun or do you have a firearm," to which the defendant replied, "I wouldn't blast you all."

prove that he was in custody during an encounter with police. *Id.* at 517.

The defendant argues that he was the subject of a custodial interrogation because the entire encounter was "police-dominated," and because when Officer Bickerton asked if he had a firearm the officer effectively communicated to the defendant that he was suspected of committing a crime. We conclude that these elements of the defendant's encounter with the police do not transform it into a custodial interrogation. Officer Bickerton did not imply that the defendant was suspected of a crime merely by asking if he was carrying a gun. Carrying a firearm is not a crime, and the defendant does not suggest any other criminal conduct of which he was suspected. Nor is the defendant's description of the encounter as "police-dominated" an accurate one. The motion judge found that the tone of the officers was conversational throughout, and at no point did the interaction become aggressive. The defendant points to no words or actions of the officers that could have transformed the nature of the encounter from informal to aggressive. Miranda warnings were not required between the announcement of the patfrisk and the frisk itself. To the extent that any statements made during that interval were admitted at the defendant's trial, there was no error.

*Judgments affirmed.*