McCooe, J.
(dissenting). I respectfully dissent. The only witness to testify at the hearing to determine whether a loaded shotgun seized from the defendant and statements made by him upon his arrest should be suppressed was the arresting officer, a six-year veteran of the police force, who had participated in over 50 weapons-related arrests.
The officer, assigned to an anticrime unit and patrolling with *48 his partner in an unmarked police car, observed defendant and another male exiting a building located in a fairly high-crime area at 2:00 a.m. The defendant was walking with an “exaggerated” limp favoring a “stiff’ left leg while pressing his left arm “flat up against his left leg, as if holding something in place.” The defendant was wearing baggy sweat pants with a bulge below the left pocket “where he had his arm.” The officer testified that “I believed it to be, from my training and experience with past arrests, to be a weapon.”
Defendant and his companion “changed direction” upon making “eye contact” with the officer, and began walking toward a livery cab that was parked on the street approximately three car lengths in front of the building. Instead of entering the livery cab through the curbside door, defendant walked around the vehicle and tried to enter through the rear driver side door, but was unable to do so because a dumpster “block[ed] his path.” Defendant walked back around the livery cab and opened the rear passenger side door, all the while holding his leg, and “slid” and “kind of leaned” into the vehicle, because he “couldn’t really bend his leg all the way in.” Defendant maneuvered his way across the interior of the cab and sat directly behind the driver, after which defendant’s companion . entered the vehicle and sat next to the defendant. The livery cab pulled away several moments later and the police followed in their patrol car. They ordered the cab driver to pull over, the passengers to exit and patted them down. A frisk revealed defendant’s possession of a loaded, sawed-off shotgun approximately 24 to 28 inches long that “ran from his hip down to his knee,” with the butt near the left pocket area. The defendant admitted that the weapon was his.
The hearing court credited the police testimony but granted defendant’s suppression motion. It concluded that the defendant’s unusual, but “innocuous” gait and a bulge that lacked “a distinct or complete outline of a long gun” were too “equivocal” to justify the police stop of the livery cab. I disagree and would reverse denying the suppression motion.
The police may stop a vehicle based upon a “reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime” (People v Spencer, 84 NY2d 749, 753 [1995], cert denied 516 US 905 [1995]; see People v Sobotker, 43 NY2d 559, 563-564 [1978]). Reasonable suspicion is “that quantum of knowledge sufficient to induce an ordinarily prudent and cautious [person] under the *49 circumstances to believe criminal activity is at hand” (People v Martinez, 80 NY2d 444, 448 [1992], quoting People v Cantor, 36 NY2d 106, 112-113 [1975]). In a reasonable cause analysis, the emphasis should not be narrowly focused on any single factor, but on an evaluation of the totality of circumstances (see People v Evans, 65 NY2d 629, 630 [1985]). “The single issue presented — whether the action of the police officer was reasonable— ‘must necessarily turn on the facts of each individual case’ ” (People v Prochilo, 41 NY2d 759, 761 [1977], quoting People v Green, 35 NY2d 193, 195 [1974]).
Considered cumulatively, the totality of circumstances provide reasonable suspicion that defendant was armed with a shotgun (see People v Soto, 266 AD2d 74 [1st Dept 1999], lv denied 94 NY2d 925 [2000]; People v Carr, 305 AD2d 120 [1st Dept 2003]). The factors forming the basis for reasonable suspicion are the suspicious manner in which the defendant was walking stiff legged with a rigid left arm pressed against his left side as if he was holding something in place at 2:00 a.m. in a fairly high-crime area, the bulge below his left pocket, the defendant’s abrupt change in direction upon making eye contact with the officer, his circuitous entry into the livery cab which allowed defendant to sit directly behind the driver with the bulge in his left pants leg likely hidden from the driver’s view. While the officer testified that he did not “know” what the bulge was, he stated that “I believed it to be, from my training and experience with past arrests, to be a weapon.”
The majority has not ventured into offering possibilities as to what the hearing court described as “a host of innocent objects” inside the defendant’s pants leg which would cause the bulge or the manner in which he walked. The defendant at the hearing suggested an umbrella and the hearing court a leg brace or a leg cast. The officer testified that the defendant walked with a rigid left arm pressed against his side as if he was holding something in place. There would not be any need to hold fixed objects like a leg brace or leg cast in place but there would be to hold a long weapon in place so that the barrel would not hit the ground.
The officer, whose testimony was credited by the hearing court, was an experienced anticrime officer. The record indicates that he believed the concealed weapon was not a pistol or revolver at the waist but a weapon which extended down his leg. He testified as to the lengthy period of time necessary to extract the shotgun from the defendant’s pants leg after the defendant exited the cab. Based upon the length and location of the shotgun and *50 the defendant being in a seated position in the taxi, it was a judgment decision by the police officers not to have approached the vehicle at gunpoint.
The majority’s position is that the officers should have approached the defendant at gunpoint without offering any evidence as to proper police procedure, supporting case law or testimony from the officers as to why they did not. The officers were never asked that question. People v Robinson (74 NY2d 773, 774 [1989]) cited by the majority is not on point. The language cited speaks to a driver being directed to step from a car and does not address the question as to when police officers should draw their weapons.
The majority cites from the dissenting opinion of Judge Bellacosa in People v Torres (74 NY2d 224, 236 [1989]). The issue there was whether a subsequent search of the vehicle was valid. Apart from the fact this is dicta, this nonissue of drawn weapons was never raised or considered by the majority nor has it ever been raised by the parties in this action. The paragraph cited by this majority reads in pertinent part:
“Whether we dislike generally the police procedure of approaching vehicles with drawn weapons and without announced inquiry in the dangerous setting of cases like this is not determinative because those particular facets, even if viewed as unjustified in hindsight or even if viewed as preferable precautionary procedure — and I do not accept either in this case . . . .” (Id.)
There is no evidence that the police officers did not use their best judgment and act in a professional manner by not approaching the defendant at gunpoint. Such conduct is fraught with danger since it could trigger an unnecessary confrontation and risks an accidental discharge of the weapon. This decision should be left to the professional judgment of the police officers who were on the scene and were trained in response procedures.
Furthermore the statement by the majority that the failure of the police officers to draw their weapons “serves as a strong objective indicator” that the police “had not yet formed the belief that defendant was armed” (majority op at 47) highlights a fundamental disagreement with the dissent as to whose conduct should be weighed in determining whether an arrest was lawful. The majority is considering the conduct of the defendant and the police officer and the dissent is considering only the conduct of the defendant. The majority opinion relies upon the fact that the po *51 lice did not draw their weapons as having evidentiary value. I disagree.
Accepting the majority’s argument that the failure to draw a weapon and a less than positive belief that the defendant had a weapon is indicative of a lack of reasonable suspicion, it should logically follow that if the police officers had drawn their weapons and the police officer had testified that he was positive that the defendant had a weapon, this should be considered a factor in finding reasonable suspicion. Reasonable suspicion or a lack thereof should not depend upon police conduct in drawing or not drawing their weapons. Otherwise the police would draw their weapons as standard procedure in order to create reasonable suspicion to justify an arrest.
A judicial determination as to whether there was reasonable suspicion should be based upon the defendant’s conduct and not whether the police drew their weapons, justifiably or not. Simply stated, in my opinion, whether or not the police officers drew their weapons is not relevant and has no evidentiary value in a judicial determination of reasonable suspicion.
The majority and the hearing court emphasize the fact that the bulge was “shapeless,” “amorphous” or lacked the “clear outline” of a shotgun. The conclusion reached by the police officer that the defendant had a weapon on his leg was based on the totality of the factors previously described and taken in context support his conclusion. The absence of the clear outline of a shotgun is precisely the reason why a person carrying a shotgun on his leg would wear baggy pants. “Reasonable suspicion, not absolute certainty, is the applicable standard, and it is clear that the officers’ concerns were predicated upon specific and articulable facts” (People v Chestnut, 51 NY2d 14, 22 [1980]). As the Massachusetts Supreme Court recently stated in upholding police conduct in closely analogous circumstances: “The officers’ suspicion that the [defendant’s] odd way of walking was a sign of a firearm was not a mere hunch, but was the result of the application of their experience and training ... to their detailed observations of the defendant” (Commonwealth v DePeiza, 449 Mass 367, 373, 868 NE2d 90, 97 [2007] [reasonable suspicion established by defendant’s furtive movements and “straight arm” walk]).
Possessing reasonable suspicion that the defendant was armed, the police acted lawfully in stopping the livery cab (see People v Carr, 305 AD2d 120, 121 [2003], supra), ordering the defendant to exit the vehicle (see People v Mundo, 99 NY2d 55, *52 58 [2002]), and then patting him down and frisking him (see People v Mims, 32 AD3d 800 [1st Dept 2006]).
I would reverse and deny defendant’s suppression motion. McKeon, EJ., and Schoenfeld, J., concur; McCooe, J., dissents in a separate opinion.